For The Western District of Washington
At Seattle

| | |
|---|---|
| UNITED STATES OF AMERICA Plantif, | Cause Nos. CR16-07RSM and CR12-339RSM |
| vs Nathaniel Wells Defendant | Motion for Compassionate Release Due to COVID-19 |

Defendant Nathaniel Wells, submitting this motion Pro Se, moves for entry of an order as follows:

## I. Relief Requested

FILED
LODGED
RECEIVED
MAIL

OCT 08 2020

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY DEPUTY

In case No. CR 16-07RSM, Defendant seeks entry of an order pursuant to Title 18 USC § 3582(c) releasing him from confinement subject to a period of supervised release. In the alternative, Defendant request home confinement for the duration of his remaining time. Defendant seeks the same outcome for case No. CR12-339 RSM. He also seeks appointment of counsel.

## II. Facts Relevant to Motion

On March 30, 2018, Mr. Wells was sentenced in Case No. CR 16-07RSM to a term of 134 months, following a guilty plea to conspiracy to commit bank fraud.

With credit for time served prior to sentencing, Mr. Wells has served more than 58 months, with a projected release date of 7/7/2025. The Defendant has applied to the Warden of FCI Sheridan for compassionate release pursuant to Title 18 U.S.C. §3582(c)(1)(A). Thirty days has since passed with no response from the Warden. (See attached Exhibit 1.)

According to the National Commission on COVID-19 and Criminal Justice (NCCCJ) there are five key points in reported Data by state and federal correctional facilities.

1. The COVID-19 mortality rate of those incarcerated is nearly twice as large as the general public.
2. Out of 100,000 inmates, 7,000 of them have contracted COVID-19. This makes inmates four more times likely to test positive for COVID-19.
3. More research must be done to understand why some prisons are managing and others are not.
4. Prisons with a large population (1,000 or more) are dealing with high mortality rates.
5. We do not know how surrounding communities are affected by COVID-19 in it's local prison.

According to the BOP website, 11,680 positive test have been found throughout the BOP. Sheridan FCI has 4 positive test.

U.S. Marshals are still moving inmates between court and hold overs. And FCI Sheridan is accepting all incoming inmates no matter how big or small the movement is in terms of inmate count. The conditions are not optimal and further contamination is forseeable if the current conditions are continued.

Access to programing and work are non-existant for most inmates. The inmates that do work and go to education for programing is a select few. The only education program open is the GED program. The arbitrary selection of what programs and jobs that come open is a violation of due process. The defendant has no recourse to challenge any lack of diversity in programing that were he able to attend and complete would put him in a favorable possition in terms of good time credits erned per the First Step Act.

Access to medical is another issue at FCI Sheridan. There is no sick call for inmates with concerns. You have to place a "sick call sheet" in the mail and hope to get a response within 30 days. (see exhibit 2.) Rutine health checks are non existant. There is no doctor on the facility after 2pm.

Unit conditions are not optimal. Once again there are quarantine inmates within Unit 2A at Sheridan FCI. They are housed with and use the same showers and phones and computers as the Defendant and (1) other general population inmates.

FCI Shendan has been on lockdown since March of 2020. Inmates are confined to their cells 20 hours a day. Recreation is one hour for three days out of the week. Mr. Wells expresses his deep concern and the lack of diligence when it comes to sanitation and cross contamination of inmates in common areas. For example. Unit 2A in Shendan FCI is a quarantine Unit. This means that "quarantine" inmates are housed with general population inmates. All inmates come to Unit 2A to be released. Before they are "quarantined" they get the same rec. out that Mr. Wells or any other inmate that is general population would receive. Each tier recieves four hours of rec. time. Per sixty (60) inmates (120 in a full Unit) there is only four phones, six tables, five computers and six showers. Social distancing is non-existent within Unit 2A. Mr. Wells' unit is 2A

## III. Authority And Argument

Title 18 U.S.C. § 3582(c)(1) provides in part:

(1) in any case —

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the Defendant after the Defendant has fully exhausted all rights to appeal a failure of the

Bureau of Prisons to bring a motion on the
defendant's behalf or the lapse of 30 days from
the receipt of such a request by the warden
of the Defendant's facility, whichever is earlier,
may reduce the term of imprisonment (and may
impose a term of probation or supervised
release with or without conditions that does not
exceed the unserved portion of the original
term of imprisonment), after considering the
factors set forth in section 3553(a) to the
extent that they are applicable, it if finds that—

(ii) extraordinary and compelling reasons warrant
such a reduction

The application of USSG 1B1.13 in the ninth circuit
and the Western District of Washington is a point of
contention. Due to the fact that the current §3582
motion changed under The First Step Act. Before the
First Step act became law, the only way to come
before the Court would be by way of the Director
of the BOP. Currently we do not have a Sentencing
Commission. Thus we do not have a new and
complete guidance of the new §3582(c) statute
under The First Step Act.

This District has determined that the policy statement set forth in the Application Notes to USSG 1B1.13 was adopted before §3582(c)(i) was enacted and therefore parts of the policy statement are obsolete and must therefore be disregarded. Reffering to "etraordinary and compelling reasons" See (United States v. McPherson, 2020 WL 1862596)(W.D. Washington 2020)

The Court in United States v. Maumau, 2020 WL 806121 (D.Utah 2020) stated that:

> While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of "whether extraodinary and compelling reasons" warrant a sentence reduction under §3582(c)(1)(A)(i). An interpitation of the old policy statement is binding on the new compassionate release procedure is likely inconsistent with the Commission's statutory role... It is also inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which explicitly allows courts to grant such motions even when BoP finds they are not appropriate... Thus, courts may, on motions by the Defendant, consider whether sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement.

## Extraordinary and Compelling Circumstances

Despite the efforts of BOP staff at FCI Sheridan, the facility has faced several small COVID-19 outbreaks. The practice after one becomes positive with COVID-19 are scary at the very least. Staff at FCI Sheridan work between three facilities at FCI Sheridan. Once a person is sick within the medium facility, they are moved to the FDC at Sheridan. The scary part is the staff will then report to the Government that there arent any cases at FCI Sheridan. This is a human shell game that is dangerous and very deceptive. Testing, according to the BOP website is at 262 test conducted. 90% of those test were conducted in the FDC at Sheridan and Federal Prison Camp at Sheridan. Around fifteen inmates that were presumed to have contracted COVID-19 were in units outside of the Unit 2A, also known as the "quarantine unit". There are multiple habeus cases against FCI Sheridan. In Shepherd v. Cooper (See exhibit 8), the BOP gives a outline of quarantine inmates and how they are treated. It gives every detail but one. It fails to mention where quarantine inmates are housed and if they are amongst other inmates in general population. COVID-19 is moving throughout this facility due to lack of testing and failure to cancel inmate movement. The BOP is still moving inmates between facilities like CCA parump and FDC Sea-Tac.

General population inmates in unit 2A are required to share four (4) phones, six tables (6), five (5) computers and six (6) shavers. All of these facilities mentioned above are shared with 65+ inmates at any given time. The Defendant can not account for any others in terms of what they touch, who they come into close contact with and if they sanitize their hands after every encounter with germs. Even if Mr. Wells was a total germaphobe and had OCD in cleaning, he could not account for the countless others and the higher ups who decided it was a bright idea to transfer inmates during a world wide pandemic. The above mentioned is just a few of the many ways it is impossible to self care within FCI Sheridan.

Mr. Wells is 5'9" and 227 lbs. Per BMI these numbers bring about a BMI score of 33.5. As this pandemic has progressed so has the CDC's comorbitity list. The CDC has stated that anyone with a BMI of 30+ is at a highten risk of severe injury or death. Thus a BMI that consists of 33.5 is a comorbitity. The ability to self care with this high risk COVID-19 factor is not optimal and is prohibited within Sheridan FCI. How do you ask? The only proper and healthy way to self care with a comorbitity of obesity is to diet and exercise. Sounds easy right? Under normal circumstances it is easy. But, for 90+ days inmates were on 23 hour lockdown, for another 60+ days inmates only had

two hours out of the cell. Inmates (including the Defendant) used this time to shower after exercising. So for 60+ days every three days we could exercise for an hour. Since then the facility stopped Inmates from working out in the unit due to social distancing. So exercise is a no-no and is now a sanctionable offense subject a disciplinary report. It is now illegal to work out within the unit. Now. The Defendant still has the ability to diet correct? Wrong! food service serves the same high carb diet every day. Bread is served with pasta and light vegetables at almost every meal. Cake is served every morning. The food at FCI Sheridan will kill a person without proper exercise. Self care with a high risk factor of Obesity is not possible in the current lockdown conditions of FCI Sheridan. Mr. Wells has been obese since his initial check up at Sea-Tac. It is also the only check up he has had in a five year prison stint. (see exhibit 2.)

Mr. Wells has been confined at FCI Sheridan since May 1, 2018. He has completed every class required of him. He has maintained employment with good work reports and he also has paid restitution every month at $100.⁰⁰ per month. Mr. Wells would like the court to take in account of his restitution payments while incarcerated. It is an obligation he takes serious and it is laudable that he is able to maintain these payments at minimal work pay. It is simply not true that Mr. Wells has not

made any payments in restitution. It is unfortunate that Mr. Wells had prior obligations and those funds are being disbursted as the clerk of the court decides. Despite this fact Mr. Wells is indeed making contributions to his court ordered obligations. (See exhibit 3)

### Section 3553 Factors

### (1.) Nature and Circumstances of the Offense and of the Defendant

The Defendants crime although serious was a non-violent offense. No wepons were possessed or involved. The Defendant has a prior domestic violence conviction from the year 2004. The Defendant has four close family members that have federal convictions. His mother abused drugs during his childhood. His siblings have trouble with substance abuse. The Defendant is a present father and trys his best to play a active role in the childrens lives even under the current conditions.

### (2.) Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote respect for law and provide just punishment for the offense.

The Defendant has served 58 months of a 134 month sentence. The latter duration of the sentence

has been served under constant danger due to COVID-19 were the defendant is more likely to contract the virus than the general public. Add a comorbidity of obesity that also makes Mr. Wells high risk to COVID-19. Mr. Wells is unable to social distance, which is essential to Mr. Wells survival of a virus to which he does not know he will recover from. Under these conditions a 58 month sentence should suffice. Mr. Wells has completed 60% of his sentence. This should be enough time to promote respect for the Law. If this court should not agree, Mr. Wells asks this court to send him to home confinement for the duration of his time following supervised release.

(3.) Provide the Defendant with Educational and Vocational Training

Education and Vocation are not available at this time. (See exhibit 3)

(4.) The Need to Protect the Public from further Crimes

Mr. Wells is 38 years of age and has spent the better part of a decade in prison. He understands that his time is running out and he must be a member of the public and not oppose it.

The sooner he returns to society the sooner he can contribute to society. Thus, a shorter sentence helps the public in terms of Mr. Wells.

(5.) Kinds of Sentences Available

Defendant was convicted of conspiracy to commit bank fraud which carries a maximum sentence of 30 years. See 18 U.S.C. §§ 1344 and 1349.

(6.) Kind of Sentence and Range

The Court's guideline calculation in this case was a level 30 at category VI, yielding a range of 168 to 210 months. The Defendant recieved an under the guideline sentence of 134 months. This court now has a broad range of discresion under § 3582(c)(1)(A) This court can impose conditions to home confinement not to exceed the remainder of his sentence. This court can also impose a longer term of supervised release. The Defendant asks this court to use it's wide range of tools to save his life as a preventative mesure.

(7.) Need to Avoid Unwarranted Sentence Disparities

Defendant's Sentence brings questions of disparties.

four people were indicted on Jan. 5th, 2015. Out of his co-conspirtors Mr. Wells recieved an 134 month sentence compaired to others indicted and not indicted it's a 124% increase over other Defendant's. Two people who admitted to being involved willingly were not indicted at all. Those two Defendants avoided prosecution due to copperation with the government. In exchange they got lighter sentences an violent crimes and did not face federal prosecution. Statements made by Melisa Sanders, Micah Quinn and Josh Means all make comments about Mr. Wells' involvement. None of them claim to know. (See exhibits 4,5 and 6)

Mr. Wells does not wish to seek reconsideration of the order by this court for loss and sentencing enhancements. Mr. Wells is requesting that this court looks to the testimony provided by varias Agents and Defendants alike. The Defendant also knows how voluminas and legnithly the evidentiary heanings were. In respect to 3553(a)(7), The Defendant recieved a more serias sentence than others that done the same conduct.

## (8.) Need to Provide Restitution

Restitution in this case was set at $6,816,263.51. When this court imposed restitution it concluded that Mr. Wells would never pay this amount of restitution. Since accepting the Finacial Responsibility Program's peramiters (FRP) Mr. Wells has not missed a payment. Mr. Wells continues to pay monthly

despite the huge financial burden. Mr. Wells would like to contribute more to his financial burden.

## Danger to Others Safety and the Community Safety

Mr. Wells does not present a danger to others safety, nor a danger to the safety of the community. The Defendant does not have a violent history. He has a domestic violence conviction that is 16 years old. The Defendant would despite the argument that he is violent when R.C.W's violent crime statutes cannot be used to enhance a crime due to vaguely written statutes. (See US v. flores-Valdevia)

Mr. Wells has maintained employment, has been incident free, maintained rehabilitive courses up until COVID-19 and has kept current with his restitution responsibilities (see exhibit 3.)

The question as to whether Mr. Wells will reoffend or not is speculitive at best. Mr. Wells currently does not place the safety of others and the community in danger.

## IV. Confinement v. Release

In quoting the Court on it's current requirements to meet §3582(c)(1)A), this Court states; (i) whether the inmate is at higher risk because of his or her age and/or race;

(ii) whether the inmate has one or more, medically-documented, chronic health conditions that render him or her more vulnerable to COVID-19; (iii) the fatality rate for individuals with similar health conditions as compared with the overall fatality rate for COVID-19; (iv) whether the inmate has priorly tested positive of COVID-19, if so, whether suffers from any long-term effects of the disease; and (v) whether the inmate's release is expected to reduce the risk of him or her contracting COVID-19 (US v. Powers, No. CR15-166 TSZ, 2020 WL 3605748, *2 (W.D. Wash. July 2, 2020)

    The Court was presented with Mr. Wells health issues and concerns. Mr. Wells is a 38 year old African American with a (BMI) body mass index of 33.5 which constitutes a chronic health condition according to the CDC. These numbers also consist of a high risk to COVID-19. (see exhibit 2) The CDC also places African Americans as having high-risk factor. Johns Hopkins also discounts age (as in 50+) being a non-factor to people with a BMI of 30+. The CDC states the same.

    Mr. Wells asks this court to be consistant with perameters set out in US v. Powers, No. CR15-166 TSZ, Mr. Wells meets the requirement of (ii) whether the inmate has one or more, medically-documented, chronic health conditions that render him or her more vulnerable to COVID-19.

    Mr. Wells' release would reduce the risk of contracting COVID-19. United States Senator Ron Wyden express' the same concerns as inmates' and staff at FCI Sheridan (see exhibit 7.) There have been questions about the handling of

COVID-19 within FCI Sheridan. Senator Wyden even
questions how inmates are being isolated. This question has
been and still is being avoided. Per Brice Ingram's
Declaration (Shepherd v. Cooper, No. 3:20-cv-01262-AC, Document
10, page 7) Ingram, who is Safety at FCI Sheridan declares
that;

> "Though we initially housed all new inmates
> in quarantine at the FDC, we have since
> modified that to house new inmates ultimately
> designated to the FCI within the FCI itself"

    Ingram then continues to state that the FCI has enough
"space" to quarantine new inmates but fails to specify exactly
where these inmates are housed. This statement is not true.
Unit 2A is not secluded from the rest of the prison. Inmates
throughout the prison come to Unit 2A to quarantine. Thus Unit
2A is in constant contact with the rest of the prison due
to contact with inmates from other Units within FCI
Sheridan. Unit 2A is in perpetual danger as inmates come
in and out of Unit 2A where Mr. Wells is housed. The Defendant
asks this Court to inquire about such practices if what he
presents is not enough to please the Court. The Defendant
proffers evidence that inmates are quarantined within
his unit on the upper tier of Unit 2A. This evidence
consist of a staff memo to gaurds servicing quarantine
inmates (See exhibit 11.) Mr. Wells would not be able to gather

this evidence without quarantine inmates within his unit.
Mr. Wells asks the question whether holding quarantine inmates
in the same space as general population inmates follows
directives of HHS (human health services) or the CDC (centers
of disease control)? Is the practice of moving inmates to
another unit with people who are not quarantining safe?
Is there a such thing as cross contamination between
inmates?

　　　Mr. Wells disputes the fact of Sheridan Prison Camp
is the only facility on FCI Sheridan's compound with a
positive COVID-19 test. The Defendant submits the Governments
own words on cases at FCI Sheridan. (See exhibit 10.)
Case No. 3:20-cv-01262-AC Document 9, Page 17 and 18 Describe
where cases of COVID-19 were found at FCI Sheridan, not
the camp.

　　　Mr. Wells also proffers further evidence that more
than one outbreak has happen at FCI Sheridan. Amanda
Huston lays out the facts in her Declaration in Case No.
3:20-cv-01262-AC US v. Shepherd. (See Exhibit 12.) These
practices are dangerous and put Mr. Wells in direct danger
of contracting COVID-19 base on inmate transfers within
and incoming to FCI Sheridan. The Defendant contends
that FCI Sheridan Unit 2A is acting with deliberate
indifference when it comes to the safety of inmates within
that specific unit, that includes the Defendant. Release is
suited much better for an inmate such as Mr. Wells
compared with constant contact with inmate outside of

his assigned unit. The Defendant will be able to social distance within his own home. He will also be able to work on his chronic health condition by eating better and working out. He could better contribute to his restitution and be a better father. This can be accomplished by supervised release or home confinement for the duration of his sentence. Release outweighs the dangers of unit 2A.

Mr. Wells presents to this court, the CDC's "Summary of recent changes" (Dated July 17, 2020) It state "people of any age with certain underlying medical conditions". Included in the list of conditions is obesity. Mr. Wells' age is not a risk factor, but Mr. Wells has a high risk factor none the less. If Mr. Wells was of age he would have two risk factors according to the CDC. (see exhibit 12.)

Mr. Wells also presents research done the only way he can, family has helped The Defendant research how is risk factor impacts the statistics gathered by good news and science resources. (See exhibit 13.) A BMI of more than 30 yields a 33% greater risk of dying than those who were not obese.

To summarize the Defendants risk factors, he is a 38 year old (a non factor in terms of risk with age alone), African American male with a BMI of 33.5. Mr. Wells in fact has three CDC guideline risk factors. Race, Sex and Obesity.

## Extraordinary and Compelling Reasons

For all previously stated reasons this Court should grant compassionate release. Cumlative risk factors that also go outside of just health concerns are present in this case. A constant threat of the virus is what this Defendant has lived with for seven plus months. The Defendants health and the fact that FCI Sheridan is actively lying about outbreaks and where they have quarantine inmates is cruel and unusual.

## V. Conclusion

FCI Sheridan Unit 2A is acting with delibrate indiffrence. Mr.Wells health condition along with being housed with quarantine inmates causes extraordinary and compelling reasons to release the Defendant to either home confinement or supervised release.

Nathaniel Wells Jr #61833-086
FCI Sheridan
P.O. Box 5000
Sheridan, OR 97378

# CERTIFICATE OF SERVICE

I certify that on October 5, 2020, I placed this motion in the mail addressed to The Honorable Ricardo S. Martinez.

Nathaniel Wells Jr. # 37833-086
FCI Sheridan
P.O. Box 5000
Sheridan, OR 97378

Exhibit 1

TO: J. Salazar                          June, 16 2020

From: Nathaniel Wells jr #37833-086

Motion under 3582(c)(1)(A) for compassionate release

I, Nathaniel Wells jr (herein Mr. Wells) compel Warden J. Salazar for compassionate release under § 3582(c)(1)(A). Mr. Wells resides in unit 2A of Sheridan FCI. During the pandemic unit 2A has become a quarintine unit. This means that general population inmates are in the same unit as "quarantine" inmates. This is a concern from Mr. Wells due to the fact he is 47 lbs. over wieght and suffers from obesity. Obesity is a risk factor for COVID-19. Obesity leads to high blood pressure and leads to more serias outcomes if infected with COVID-19.

Mr. Wells has a current release plan. He will release to Jazmine Fields in Belleve, WA. Phone number and address can be forwarded at the administrations request. He also has employment waiting for him upon release. He will work from home doing legal research for counsel.

# CERTIFICATE OF SERVICE

I hereby certify that on June, 16 2020 I hand delivered the foregoing with the Unit Team of 2-A located in FCI Sheridan.

Nathaniel Wells jr #37833-086
FCI Sheridan
P.O. Box 5000
Sheridan, OR 97378

Exhibit 2

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
U.S. DEPARTMENT OF JUSTICE

**FEDERAL BUREAU OF PRISONS**

| TO: (Name and Title of Staff Member)  Medical | DATE: 6/9/20  REC 7/1/20 |
|---|---|
| FROM: Nathaniel **WELLS** | REGISTER NO.: 37833-086 |
| WORK ASSIGNMENT: EDU-W | UNIT: 2-A **2A-127** |

TO:

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.)

I would like a copy of my medical records.

I would also like to know why I've never recieved a full physical since being in this institution for over two years.

---

.(Do not write below this line)

DISPOSITION:

A FULL HISTORY AND PHYSICAL WAS COMPLETED AT SEATAC ON 1/15/16. A REPEAT HISTORY AND PHYSICAL IS NOT REQUIRED UNLESS YOU REMAIN IN TRANSPORT GREATER THAN 30 DAYS BETWEEN FACILITIES.

YOU LEFT SEATAC ON 5/1/18 AND ARRIVED AT SHERIDAN ON 5/1/18.

IF YOU HAVE A HEALTH CONCERN, SUBMIT A SICK-CALL REQUEST FORM TO HEALTH SERVICES.

SUBMIT A SEPARATE FORM (BP-A0148) TO REQUEST COPIES OF MEDICAL RECORDS.

| Signature Staff Member  M. Morgan | Date  06·30·20 |
|---|---|

Record Copy - File; Copy - Inmate
(This Form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

Exhibit 3



## Individualized Needs Plan - Program Review   (Inmate Copy)

**Dept. of Justice / Federal Bureau of Prisons**

Plan is for inmate: WELLS, NATHANIEL JR  37833-086

**SEQUENCE: 01423072**
**Team Date: 09-17-2020**

| | | | |
|---|---|---|---|
| Facility: | SHE  SHERIDAN FCI | Proj. Rel. Date: | 07-11-2025 |
| Name: | WELLS, NATHANIEL JR | Proj. Rel. Mthd: | GCT REL |
| Register No.: | 37833-086 | DNA Status: | SET02767 / 10-19-2010 |
| Age: | 38 | | |
| Date of Birth: | 08-23-1982 | | |

### Detainers

| Detaining Agency | Remarks |
|---|---|

*NO DETAINER*

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| SHE | FCI EDU W | EDUCATION | 04-08-2019 |

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| SHE | ESL HAS | ENGLISH PROFICIENT | 04-07-2009 |
| SHE | GED HAS | COMPLETED GED OR HS DIPLOMA | 05-19-2009 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| SHE | C | DIVERSITY FAIR 2020 | 02-04-2020 | 02-04-2020 |
| SHE | C | BLACK HISTORY 2020 | 02-21-2020 | 02-21-2020 |
| SHE | C | BLACK HISTORY 2020 | 02-21-2020 | 02-21-2020 |
| SHE | C | AUTO SALES 101 | 07-01-2019 | 09-13-2019 |
| SHE | C | BUSINESS: CONCERT & MUSIC | 04-01-2019 | 06-10-2019 |
| SHE | C | BLACK HISTORY 2019 | 02-19-2019 | 02-19-2019 |
| SET M | C | BASIC ADOMINAL WELLNESS | 11-11-2016 | 01-18-2017 |
| SHE | C | WALKING CLASS 1-2PM M-F | 04-20-2014 | 07-01-2014 |
| SHE | C | WALKING CLASS 1-2PM M-F | 10-22-2013 | 12-29-2013 |
| SHE | W | INTRO TO REAL ESTATE | 10-16-2013 | 12-22-2013 |
| SHE | C | MONEY SMART | 10-21-2013 | 11-21-2013 |
| SHE | C | PRE REL HEALTH/NUTRITION(E3) | 09-03-2013 | 09-03-2013 |
| SHE | C | BREAKING BARRIERS/FCI MWF (E4) | 09-04-2013 | 10-22-2013 |
| SHE | C | FCI JUMP ROPE M-F | 07-24-2013 | 10-10-2013 |
| SHE | C | FCI MAINSTREAMING GOIN HOME | 06-07-2013 | 10-09-2013 |
| SHE | C | PRE RELEASE PER. GROWTH(E4) | 08-13-2013 | 08-13-2013 |
| HER | C | RDAP 8-11 A.M. | 02-01-2010 | 10-03-2011 |
| HER | C | HEALTH SERVICES | 06-14-2011 | 06-14-2011 |
| HER | C | CONSUMER CREDIT (RPP3) | 06-14-2011 | 06-14-2011 |
| HER | C | US PROBATION OFFICE (RPP4) | 06-14-2011 | 06-14-2011 |
| HER | C | RELEASE PROCEDURES (RPP5) | 06-14-2011 | 06-14-2011 |
| HER | C | (RPP 6) EMPLOYABLE LIFE SKILLS | 06-14-2011 | 06-14-2011 |
| HER | C | FUTURES/OPTIONS | 09-28-2009 | 11-18-2009 |
| HER | C | FUTURES/OPTIONS | 07-06-2009 | 09-14-2009 |
| HER | C | VT COMPUTER TECH PM (RPP2) | 07-06-2009 | 09-14-2009 |
| HER | C | SMALL BUSINESS (RPP2) | 06-19-2009 | 08-05-2009 |
| SET M | C | BASIC SCREEN WRITING CLASS | 05-11-2008 | 07-02-2008 |
| SET M | C | BEGINNERS CHESS CLUB | 10-25-2007 | 12-23-2007 |

### Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|

*** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ***

### Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 01-05-2016 |
| CARE1-MH | CARE1-MENTAL HEALTH | 04-09-2013 |



## Individualized Needs Plan - Program Review    (Inmate Copy)

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: WELLS, NATHANIEL JR   37833-086

**SEQUENCE: 01423072**

**Team Date: 09-17-2020**

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| PAPER | LEGACY PAPER MEDICAL RECORD | 12-19-2018 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 01-15-2016 |
| YES F/S | CLEARED FOR FOOD SERVICE | 01-15-2016 |

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| ED COMP | DRUG EDUCATION COMPLETE | 07-02-2019 |

### FRP Details

Most Recent Payment Plan

**FRP Assignment:** **PART**   **FINANC RESP-PARTICIPATES**   **Start: 09-09-2019**

| Inmate Decision: | **AGREED** | **$100.00** | Frequency: **MONTHLY** |
|---|---|---|---|
| Payments past 6 months: | **$600.00** | | Obligation Balance: **$5,826,263.51** |

### Financial Obligations

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 3 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 2 | REST FV | $11,496.25 | $9,324.69 | IMMEDIATE | AGREED |

| | Adjustments: | Date Added | Facl | Adjust Type | Reason | Amount |
|---|---|---|---|---|---|---|
| | | 09-10-2020 | SHE | PAYMENT | INSIDE PMT | $100.00 |
| | | 08-07-2020 | SHE | PAYMENT | INSIDE PMT | $100.00 |
| | | 07-10-2020 | SHE | PAYMENT | INSIDE PMT | $100.00 |
| | | 06-10-2020 | SHE | PAYMENT | INSIDE PMT | $100.00 |
| | | 05-12-2020 | SHE | PAYMENT | INSIDE PMT | $100.00 |
| | | 04-10-2020 | SHE | PAYMENT | INSIDE PMT | $100.00 |

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 4 | REST FV | $5,816,938.82 | $5,816,938.82 | IMMEDIATE | AGREED |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |

### Payment Details

| Trust Fund Deposits - Past 6 months: | $2,405.25 | Payments commensurate ?  Y |
|---|---|---|

New Payment Plan:    ** No data **

### Progress since last review

You have continued to maintain clear conduct and good work reports. You have not saved $5 per month by placing the funds in the Pre-Release account. Due to COVID restrictions you have not continued to take classes through the education department, such as the brain games class and the parenting class.

### Next Program Review Goals

By 3/2021 Continue to maintain clear conduct and good work reports. Save $5 per month by placing the funds in the Pre-Release account. If COVID restrictions are lifted continue to take classes through the education department, such as the brain games class and the parenting class.

### Long Term Goals

By 04-2023 have saved $180 for release consideration. Continue to participate in programs at your current pace. Maintain clear conduct with good work reports.

### RRC/HC Placement

No.
Management decision - will consider when within 17-19 months. .

### Comments

11-05-18/B. CRAY 2CC/6MO=1600.50, BAL=85.07/FRP=25 QU

Cannot update contacts due to the following error message:
We're sorry about this error,
Insight seems to have experienced a problem...
Bug
If this problem persists, please make sure Systems Development Branch is aware



**Individualized Needs Plan - Program Review     (Inmate Copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: WELLS, NATHANIEL JR  37833-086

**SEQUENCE: 01423072**
**Team Date: 09-17-2020**

by submitting a trouble ticket with the error message potentially listed below in red.
Thanks for your patience!

Insight Home



**Individualized Needs Plan - Program Review   (Inmate Copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: WELLS, NATHANIEL JR  37833-086

**SEQUENCE: 01423072**
**Team Date: 09-17-2020**

Name:  WELLS, NATHANIEL JR
Register No.:  **37833-086**
Age:  38
Date of Birth:  08-23-1982

DNA Status:  SET02767 / 10-19-2010

Inmate   (WELLS, NATHANIEL JR. Register No.: 37833-086)

Date

Unit Manager / Chairperson

Case Manager

Date

Date

Exhibit 4

1    activities that you engaged in?

2    A    Yes.

3    Q    And the purpose of renting rooms, as I understand it, was so

4    that somebody could use the phone line or the wireless

5    connection --

6    A    Yes.

7    Q    -- at the hotel?

8    A    Yes.

9    Q    Do you recall approximately how many times you rented rooms?

10   A    Oh, a dozen.  I don't know.  I didn't count.

11   Q    More than five?  Do you remember?

12   A    I think it was five or less.

13   Q    Do you remember the names of the hotels?

14   A    DoubleTree, Radisson, Gateway, Marriott in Renton.  I mean, a

15   couple.

16   Q    And when you rented these hotel rooms, did somebody else

17   direct you to rent them?

18   A    Yes.

19   Q    Who was that?

20   A    Lonnie.

21   Q    Did Mr. Wells ever direct you to rent hotel rooms?

22   A    No.

23   Q    And you testified that you paid for the rooms but then

24   somebody paid you back?

25   A    Well, Lonnie would give me -- put the money in my bank

1   account and I would use my credit card.

2   Q   Okay.  Did Mr. Wells ever put money in your bank account?

3   A   No.

4   Q   You purchased cards as part of the activities that you just

5   described in your testimony?

6   A   Yes.

7   Q   Did Mr. Wells ever give you money to purchase cards?

8   A   No.

9   Q   Did Mr. Wells ever pay you to purchase cards?

10  A   No.

11  Q   You testified that you used your house -- or that somebody

12  stored precious metals or blocks of gold or blocks of copper at

13  your house --

14  A   Yes.

15  Q   -- or your apartment?

16  A   Yes.

17  Q   Did you do that for Mr. Wells?

18  A   No.

19  Q   You rented a storage locker at one time?

20  A   Yes.

21  Q   And did you rent the storage locker at the direction of

22  Mr. Wells?

23  A   No.

24  Q   You put things in the storage locker?

25  A   Yes.

1    Q    Did you put things in the storage locker of Mr. Wells'?

2    A    No.

3    Q    The activities that we just described, MoneyGrams, renting

4    rooms, purchasing cards, storing precious metals, renting a

5    storage locker, Mr. Wells never paid you to do any of those

6    things, did he?

7    A    No.

8    Q    And what about loading cards, did somebody pay you to load

9    cards?

10   A    Yes.

11   Q    And you indicated that you saw other people loading cards?

12   A    Yes.

13   Q    How many times did you load cards?

14   A    I can't remember.

15   Q    Can you give us a ballpark estimate?

16   A    About 20 or more times.

17   Q    Twenty times.

18        And how many times did you observe other people loading

19   cards?

20   A    About that much.

21   Q    About 20 times?

22   A    Yeah.

23   Q    And when you observed other people loading cards, where did

24   this happen, where did this take place?

25   A    In the motel and Erin Wiley's house and Nate Wells' house.

1   Q   Who did you see loading cards?

2   A   It was a lot of people.

3   Q   Just a lot of people?

4   A   Yeah.

5   Q   Do you remember their names?

6   A   Paris, Rodney, Shumika, Juanita -- no, not Juanita --

7   Juanita, and other people.

8   Q   And other people?

9   A   Yeah.

10  Q   When you saw these people loading cards, do you know who

11  directed them to load the cards?

12  A   Yes.

13  Q   Who?

14  A   Lonnie.

15  Q   Now, when you're loading cards, somebody else is out at the

16  store or some other location using the card; is that correct?

17  A   Yes.

18  Q   And somebody is calling in to you and telling you how much

19  money to put on the card?

20  A   Yes.

21  Q   And you testified that there were approximately 46 people who

22  were out there using the cards?

23  A   Forty-six?

24  Q   How many people were using the cards?

25  A   Four to six people.

1   Q   Forty-six?

2   A   Four to six people.

3   Q   Four to six people.   Okay.   I'm sorry.   You know, four to

4   six, or 46 people were?

5   A   Four to six.

6   Q   Four to six people.   Okay.

7       And these people used the cards.   And then if they got money

8   for using the cards, did they pay any of that money back to you?

9   A   No.

10  Q   Did they pay any of that money back to anybody else?

11  A   I don't know.   I never paid any attention to everybody --

12  everybody getting paid.   I just pay my own ticket.   I just watch

13  myself.

14  Q   So these people who were out using the cards, were they

15  kicking money back to Lonnie Lillard?

16  A   Yeah, I'm pretty sure.   Yeah.

17  Q   But you don't know that for sure?

18  A   No.

19  Q   Do you know if the people who were out using the cards, were

20  they kicking money back to Nathaniel Wells?

21  A   I don't know that.   I didn't have communication with

22  Nathaniel Wells that often.

23  Q   Okay.

24  A   I only talked to him when my brother told me to call him on

25  the phone.

Exhibit 5

1   Q   Nine felonies?

2   A   Yep.

3   Q   Okay.  So we know one of them is robbery and one of them is

4   bail jumping.  What are the other felonies for?

5   A   Just escape from community custodies, bail jumping, and one

6   identity theft, and an assault three.

7   Q   You have been to prison?

8   A   Yes.

9   Q   How much time have you done in prison?

10  A   I did three years my first time.

11  Q   And this was before the robbery?

12  A   Yes.

13  Q   Okay.  Now, your next stint with Mr. Lillard, what, if

14  anything, did you do to assist Mr. Lillard with his activities?

15  A   What do you mean?

16  Q   Well, what did you -- you went to Western Union offices?

17  A   Yes.

18  Q   Did you load cards?

19  A   Yes.

20  Q   Did you act as a runner?

21  A   Yes.

22  Q   What else did you do?

23  A   Virtually everything.  I did everything that everyone else

24  was doing.

25  Q   Well, what are some of the other things that you did besides

1    act as a runner and load cards and go to Western Union offices?

2    A    I went to stores with Lonnie, looked at different merchant

3    machines, I went around and got receipts with him, for him, I

4    lived at his house with him.  Did -- did everything.

5    Q    And during the time that you were doing all of these things,

6    is it fair to say that you did not have much involvement with

7    Mr. Wells?

8    A    No, I didn't.

9    Q    And when you did all of these -- so you were pretty close to

10   Mr. Lillard for this period of time, were you not?

11   A    Yes.

12   Q    And when you did all of these things that you were doing, was

13   it mostly under Mr. Lillard's direction?

14   A    Yes.

15   Q    Now, during the period of July to November of 2015, were

16   there other people acting as card loaders?

17   A    Yeah.

18   Q    Besides you?

19   A    Yes.

20   Q    How many other people were loading cards besides you?

21   A    I don't know.  It would change, you know, off and on.  You

22   know, new people would come on; other people would act as

23   runners.  I don't know.  Probably five or six people.

24   Q    I'm just trying -- I'm sorry.  This isn't a test, but I'm

25   trying to get a sense of how many -- approximately how many other

1             RECROSS-EXAMINATION

2    BY MR. LEVY:

3    Q   Do you know what's involved in programming the machine,

4    Mr. Quinn?

5    A   You mean programming the point-of-sale machines?

6    Q   Yes.

7    A   No.

8    Q   You don't know what's involved?

9    A   No.

10   Q   Do you know who knew how to program the point-of-sale

11   machines?

12   A   Yeah.  Lonnie.

13   Q   Did you ever see Mr. Wells program a machine?

14   A   No.

15   Q   And you said that you saw him load cards?

16   A   Yeah.

17   Q   Where?

18       MS. BECKER:  I'm sorry.  Who?

19   A   Everywhere.

20       MS. BECKER:  Mr. Lillard?

21       MR. LEVY:  Mr. Wells.

22   Q   Did you see Mr. Wells load cards?

23   A   Yeah.

24   Q   Where?

25   A   Emerge Industries.

1          MR. LEVY:  Nothing further.

2          THE COURT:  All right.  Counsel, that will bring us to

3     the end of our day.  Because of the Court's schedule, we'll start

4     at 9:30 tomorrow, but we will do our best to maximize our time

5     for tomorrow.  All right.  So 9:30, right here.

6          We will be at recess.

7                    (Proceedings adjourned.)

8

9                    C E R T I F I C A T E

10

11      I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

12   United States District Court in the Western District of

13   Washington at Seattle, do certify that the foregoing pages are a

14   true and accurate transcription of the proceedings to the best of

15   my ability.

16

17

18                    /s/ Nickoline Drury

19                    Nickoline Drury

20

21

22

23

24

25

Exhibit 6

1    use a merchant ID and they would run a reversal back onto a card,

2    thus loading money from that particular merchant, add it to their

3    account, back onto a particular card.

4    Q    So a reversal would occur, for example, if somebody -- if it

5    were not a fraudulent transaction, a reversal would occur where

6    somebody would purchase goods and then take them back and then

7    the funds that were originally used to purchase the goods would

8    be loaded back onto the card.  Is that essentially what a

9    reversal consists of?

10   A    That's how I understand it.

11   Q    In this case, with respect to the fraudulent transactions, do

12   we know which individual loaded the cards?

13   A    Not for every single transaction, we do not.

14   Q    Okay.  For some of these transactions, we know that a certain

15   specific individual was the one who actually loaded the cards in

16   that particular transaction?

17   A    You're making a distinction between who loaded the cards and

18   who then spent the cards, is that what I'm understanding?

19   Q    Well, let me --

20   A    I don't know if -- sorry to interrupt -- I don't know if --

21   we cannot say who loaded the transaction with certainty.

22   Q    Okay.  And we know with respect to Exhibit 7, the one with

23   the pictures, we know, in the case of certain transactions, who

24   the individual was who attempted to use that particular card?

25   A    Correct.

Exhibit 7

RON WYDEN
OREGON

RANKING MEMBER OF COMMITTEE ON
FINANCE

221 DIRKSEN SENATE OFFICE BUILDING
WASHINGTON, DC 20510
202 224 5244

# United States Senate
WASHINGTON, DC 20510-3703

COMMITTEE ON FINANCE
COMMITTEE ON BUDGET
SELECT COMMITTEE ON INTELLIGENCE
JOINT COMMITTEE ON TAXATION

April 20, 2020

Michael Carvajal
Director of Federal Bureau of Prisons
320 First St., NW
Washington, DC 20534

Dear Director Carvajal,

I write with deep concern for the health and safety of the incarcerated people and for the employees that work in our federal prisons. I respectfully request an update about any steps the Bureau of Prisons (BOP) is taking to protect federal prison facilities, specifically regarding the federal correctional institution in Sheridan, Oregon (FCI Sheridan).

My office has received numerous alarming reports from employees and family members of inmates at FCI Sheridan, alleging that proper precautions to prevent the spread of COVID-19 are not being followed. In light of national reporting that has demonstrated the ferocious infectivity of COVID-19 in confined spaces such as prisons, it is of paramount importance that BOP address these concerns. This crisis must be met with the strictest commitment to the health and safety of everyone, whether incarcerated or not.

With this commitment in mind, please answer the following questions about the safety of FCI Sheridan during this crisis.

- How is BOP implementing social distancing requirements, including while prisoners are in cells, during mealtimes, and during work time?
- What procedures are BOP staff following when an incarcerated person begins to show symptoms of COVID-19 and how do those procedures change as the person either begins to recover or their condition worsens?.
  - Additionally, how is BOP facilitating the isolation of ill inmates?
- Does FCI Sheridan have facilities and supplies to handle a surge of COVID-19 cases within the incarcerated population in the prison?
  - Please provide an estimate of your current stock of personal protective equipment, an estimate of how much FCI Sheridan will need, and any current plans to obtain more equipment.
- Does FCI Sheridan have a plan in place to ensure adequate staffing, should there be a workforce shortage due to COVID-19?
- Does BOP and/or FCI Sheridan have existing relationships and emergency plans with community facilities and partners to handle a more widespread outbreak or other serious emergency during this time?
- Since the Center for Disease Control has recommended wearing protective facemasks, has this been implemented in the prison system? Are incarcerated people allowed to wear masks?

911 NE 11TH AVENUE
SUITE 630
PORTLAND, OR 97232
(503) 326-7525

405 EAST 8TH AVE
SUITE 2020
EUGENE, OR 97401
(541) 431-0229

SAC ANNEX BUILDING
105 FIR ST
SUITE 201
LA GRANDE, OR 97850
(541) 962-7691

THE JAMISON BUILDING
131 NW HAWTHORNE AVE
SUITE 107
BEND, OR 97701
(541) 330-9142

AG SUITE NE
SUITE 285
SALEM, OR 97301
(503) 589-4555

HTTP://WYDEN.SENATE.GOV
PRINTED ON RECYCLED PAPER

- What other steps have been taken to prevent the spread of COVID-19 to BOP inmates and staff?

I respectfully request a response to these questions by no later than May 1, 2020. My office initially reached out to FCI Sheridan on March 27, 2020 and has not heard back from them or from the BOP. Everyone in federal prisons, from staff to inmates, deserves a safe environment, and I am eager to hear how the BOP is acting to create one. I appreciate the unprecedented situation you find your agency in and welcome a quick response as this situation demands urgency.

Sincerely,

Ron Wyden
United States Senator

Exhibit 8

**BILLY J. WILLIAMS, OSB #901366**
United States Attorney
**JARED D. HAGER, WSB #38961**
Assistant United States Attorney
U.S. Attorney's Office for the District of Oregon
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204-2936
Phone: 503.727.1120
Email: jared.hager@usdoj.gov
          Attorneys for the Government

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| DUSTIN C. SHEPHERD, | Case No. 3:20-cv-01262-AC |
| Petitioner, | |
| v. | DECLARATION OF BRICE INGRAM IN SUPPORT OF RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 |
| ANDREW COOPER, Acting Warden, | |
| Respondent. | |

## DECLARATION

I, Brice Ingram, hereby declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746,
and submit this declaration in support of Acting Warden Andrew Cooper's Response to Petitioner
Dustin C. Shepherd's Petition for Writ of Habeas Corpus.

1.  I currently hold the position of Environmental and Safety Compliant Administrator for the
    Federal Correctional Institution in Sheridan, Oregon ("FCI Sheridan"). I have worked at the
    FCI Sheridan since 1999.

2. In my role as Environmental and Safety Compliant Administrator, I am responsible for overseeing the safety and cleaning equipment, to include chemicals, authorized by the Federal Bureau of Prisons ("BOP"), along with the staff and inmates that utilize such for FCI Sheridan.

3. This Declaration is based on my first-hand knowledge and review of agency documents, including Declarations that Health Services Administrator, Lieutenant Colonel Amanda Huston, has submitted in this matter and in a related matter, *Stirling v. Salazar*, No 3:20-cv-00712-SI (D. Or.).

4. I have written this Declaration with the assistance of counsel, and affirm each fact stated herein. If called on to testify, I would swear under oath to the truth of these facts.

### FCI SHERIDAN STRUCTURE AND POPULATION

5. FCI Sheridan is split into three separate facilities: (1) the Federal Correctional Institution ( "the FCI"); (2) the Federal Detention Center ("the FDC"); and, (3) the Federal Prison Camp.

6. Petitioner Shepherd is housed at the FCI. The FCI is divided into four housing units. Each unit has an A side, a B side, and Unit Team staff offices in between the A and B sides.

7. As of September 9, 2020, FCI Sheridan housed 1,522 inmates. The inmates are apportioned among the three facilities: the FCI has 911 inmates. The FDC has 259 inmates. The Camp has 352 inmates.

8. FCI Sheridan's population has significantly decreased over the past four (4) months. This is by design. The BOP has adopted CDC Guidelines that teach maintaining physical distance is a pillar of good practice to reduce the incidence and spread of COVID-19. In this context, overpopulation in a prison is a cause for concern. FCI Sheridan has made deliberate efforts to reduce its population.

9. As mentioned by the FPD, on April 14, 2020, FCI Sheridan housed 1,787 inmates. *See Stirling v. Salazar*, No. 3:20-cv-00712-SI, Dkt. 16, Am. Petition at 8 (D. Or. June 1, 2020). That number has steadily declined:

   a. 1,619 inmates on June 29. *See id.*

   b. 1,601 inmates on July 12. *See id.* Dkt. 27, Resp. to TRO at 11 (July 13, 2020).

   c. 1,565 inmates on July 22. *See id.* Dkt. 31, Supp. Status Rep. at 1 (July 22, 2020).

   d. 1,534 inmates on August 17. *See id.* Dkt. 38, Keller Declaration ¶ 7 (Aug. 18, 2020).

   e. 1,522 inmates on September 9.

10. In addition to reducing population, FCI Sheridan has accepted few new inmates since the pandemic arrived. Since July 2, 2020, we have taken in 23 new inmates in July, 44 in August, and 44 in September, primarily due to new designations, self-surrenders, and pre-trial inmates from the USMS. In each case, special consideration was given on where to house each inmate to ensure all safety quarantine protocols were followed.

11. All new incoming inmates to FCI Sheridan are screened for symptoms, tested, and quarantined for 14 days before being released into the general population. All inmates leaving FCI Sheridan are likewise screened, tested, and quarantined for 14 days, if possible, before entering the community. Where a 14-day quarantine is not possible, FCI Sheridan communicates that fact with appropriate community public health officials.

## BOP PHASED APPROACH

12. The BOP is currently in Phase 9 of its approach to managing the COVID-19 pandemic. Each Phase has an associated document detailing modified operations and instructions to minimize risks. *See* Ex. 1, Coronavirus (COVID-19) Phase Nine Action Plan, dated August 5, 2020.

13. The Phase 9 Action Plan was issued on August 5, 2020.  It describes guidance for transferring inmates between BOP institutions to ensure health and safety. *See id.* at 7-10.

14. Specifically, Phase 9 requires all BOP institutions, including FCI Sheridan, to be quarantined for at least twenty one (21) days in order to allow for fourteen (14) days of quarantine plus seven (7) days to test for COVID-19 both upon being admitted to and prior to release from quarantine. *See id.* at 7.

### FCI SHERIDAN'S PANDEMIC RESPONSE

15. FCI Sheridan is implementing the BOP's national phased approach. To ensure maximum physical distancing while meeting out institutional safety goals, FCI Sheridan has limited inmate movement and modified institutional operations to allow inmates on work details only if they are housed together. At the FCI we have modified operations within the inmate housing units to limit the amount of inmates out of their assigned cells at a time and in the general inmate use areas. *See* Ex. 2, Inmate Movement Emails.

16. We are mindful of the many challenges inherent in battling a highly infectious disease within the prison setting. Though our modified operations have created more onerous conditions of confinement with respect to inmate movement, our aim is to ensure maximum physical distancing among inmates and staff. Where possible, we have rolled out alternatives, such as video conferencing for inmates to speak with their legal counsel. We have one (1) Video Teleconferencing Unit (VTC) in the FCI visiting room.  Working with the Federal Public Defender's Office, we schedule VTC and unmonitored attorney calls as requested, to include accommodation of last minute requests to the best of our abilities. In addition to this, we also coordinate with the federal courts and recently local county courts to provide video hearings.

17. To minimize the incidence and spread of the coronavirus, FCI Sheridan has also

implemented sanitation and housekeeping plans, including mass purchases of cleaning chemicals, gloves, masks. *See* Ex. 3 at 1 (PPE Quarantine Inmates, dated April 30, 2020). We have taken additional steps to safeguard storage of essential equipment, including by regularly inventorying personal protective equipment and cleaning chemicals.

18. FCI Sheridan is undertaking heightened sanitation measures throughout the facility, to ensure cleanliness. *See* Ex. 4 (Covid Sanitation email with attachments, dated August 28, 2020).

19. FCI Sheridan created a safety plan to address the pandemic risks, which we have updated as needed. See Ex. 5 (COVID Safety Message Plan, dated April 6, 2020); Ex. 6 (COVID Safety Message Plan, dated July 8, 2020).

20. In addition, FCI Sheridan has modified the way it deploys our human resources in response to the pandemic.  To limit risks from staff, we impose a 14-day quarantine for staff transferring from other institutions with COVID-19 cases.  We also adapted training, using conference calls on all shifts to update and educate staff.  We are seeking to recruit and hire new staff, including Health Services staff.

21. To protect staff and inmates, FCI Sheridan has granted administrative leave for staff with increased risk due to exposure on an ongoing basis.  We offered fit-testing for N-95 respirators to all FCI Sheridan staff (308 out of 317 FCI Sheridan staff have been fit-tested), and require face coverings be worn in all public settings.  We also provided instruction on how to meet new requirements for all FCI Sheridan staff to practice good personal hygiene. If a staff member may have close contact with an inmate suspected or confirmed to have COVID-19, such as medical personnel, FCI Sheridan requires the employee to wear appropriate level of personal protective equipment, including N95 respirators, eye protection, gowns, and gloves.

22. FCI Sheridan has repeatedly reinforced the dangers of the pandemic and the importance of following mitigation measures. We have posted signs throughout the institution regarding handwashing, face coverings, proper donning/doffing procedures for PPE, and COVID-19 symptoms. We hold regular staff meetings and training to ensure staff understand COVID-19 requirements, using conference calls and modified in-person meetings to maintain distancing. For example, FCI Sheridan's weekly meeting regarding inmates housed in the Special Housing Unit was changed to a teleconference meeting to limit staff exposure from each facility. *See* Ex. 7 (SHU Meeting Teleconference Email, dated July 20, 2020).

23. FCI Sheridan tasks supervisors with inspecting the facility and identifying deviations from policy and guidance. We advise all FCI Sheridan staff that they are subject to discipline for failing to follow COVID-19 requirements. In addition, we require staff to report to management any misconduct of which they become aware, such as violations of safety protocols. We remind staff in person and in writing of their right to report safety violations without fear of retaliation, whether the report is made to institution management, Regional Offices, the Central Office, the Office of Special Counsel, or to OSHA. *See* Ex. 8 (Mandatory Use of Face Coverings for BOP Staff Memorandum, dated August 24, 2020).

24. The air handler systems at our three facilities are inspected on a quarterly basis. During these inspections a number of mechanical items are inspected to include the filtration system. We are not aware of any evidence that COVID-19 is transmitted across building ventilation systems, and the relative lack of positive cases at the FCI suggests to us that such transmission does not occur.

25. Lastly, as discussed above, it should be noted that all new inmates and soon-to-be releasing inmates must be quarantined for at least 21 days. In addition, inmates who test positive and/or are symptomatic for COVID-19 must be placed in medical isolation until they are

symptom free for at least ten (10) days.

26. Though we initially housed all new inmates in quarantine at the FDC, we have since modified that to house new inmates ultimately designated to the FCI within the FCI itself, rather than at the FDC. This change allows us to better manage the relatively limited space and beds we have at the FDC, without increasing risk of transmission because the FCI has adequate space to quarantine new inmates as necessary.

27. On September 4, 2020, FCI Sheridan received new inmate transfers. Among these new transfers, there were 3 individuals that tested positive for COVID-19. Two of those are currently quarantined at the FCI, which is their final designated facility. The other is quarantined at the FDC for now, but will be transferred to the FCI when his symptoms resolve and he no longer tests positive.

28. In sum, the BOP's Modified Operations Protocol imposes strict rules to ensure physical distancing, and remains in effect. Our primary concern is maintaining the relatively low rate of incidence and transmission of the COVID-19 virus at FCI Sheridan, while ensuring safety and general order. We continue to monitor the situation, which can be subject to daily and rapid changes.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this _14_ day of September, 2020.


BRICE INGRAM
Environmental and Safety Compliant
Administrator

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **DECLARATION OF BRICE INGRAM IN**

**SUPPORT OF RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS** was

placed within a first class postage prepaid envelope, marked LEGAL MAIL OPEN ONLY IN

PRESENCE OF INMATE and deposited in the United States Mail within the offices of the United

States Attorney or at a United States Post Office according to established office practice at Portland,

Oregon, on September 16, 2020 addressed to:

> Dustin Shepherd
> FRN: 60163-060
> FCI Sheridan
> Inmate Mail/Parcels
> P.O. Box 5000
> Sheridan, Oregon 97378

> /s/ Keith W. Ramsey
> KEITH W. RAMSEY
> Paralegal Specialist

**CERTIFICATE OF SERVICE**

Exhibit 9

BILLY J. WILLIAMS, OSB #901366
United States Attorney
JARED D. HAGER, WSB #38961
Assistant United States Attorney
U.S. Attorney's Office for the District of Oregon
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204-2936
Phone: 503.727.1120
Email: jared.hager@usdoj.gov
        Attorneys for the Government

### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | |
|---|---|
| DUSTIN C. SHEPHERD, | Case No. 3:20-cv-01262-AC |
| Petitioner, | |
| v. | DECLARATION OF AMANDA HUSTON IN SUPPORT OF RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 |
| ANDREW COOPER, Acting Warden, | |
| Respondent. | |

### DECLARATION

I, AMANDA HUSTON, hereby declare the following under penalty of perjury pursuant to 28 U.S.C.

§ 1746, and submit this declaration in support of the Acting Warden Andrew Cooper's Response to

Petitioner Dustin C. Shepherd's Petition for Writ of Habeas Corpus.

1. I hold the position of Lieutenant Commander with the United States Public Health Service

   Commissioned Corps.  I am also the Health Services Administrator and have worked at the

Federal Correctional Institution in Sheridan, Oregon ("FCI Sheridan") since 2011.  I have been a registered nurse since 2001.

2.  I have been the Health Services Administrator since July 10, 2020.  Prior to that, I was the Infection Control Nurse, and was responsible for coordinating FCI Sheridan's clinical response (in conjunction with the Clinical Director) to infectious diseases, including the novel coronavirus (COVID-19).  Additionally, I served in the role as Quality Manager, and was responsible for improving the healthcare process in Health Services.

3.  This Declaration is based on my first-hand knowledge and review of agency documents.  I have written this Declaration with the assistance of counsel, and affirm each fact stated herein.  If called on to testify, I would swear under oath that the facts described herein are true.

4.  Petitioner Shepherd is housed at the Federal Correctional Institution at FCI Sheridan ("the FCI").  I submitted a declaration in support of the Government's opposition to a substantially similar Petition for Writ of Habeas Corpus brought by an inmate at the Federal Detention Center at FCI Sheridan ("the FDC") in the case *Stirling v. Salazar*, No. 3:20-00712-SI, Dkt. 39 (Aug. 18, 2020).

### COVID-19 CASES AT FCI SHERIDAN

5.  The novel coronavirus is a devastating virus that has rapidly spread throughout the United States and entire globe.  No place is completely safe from the disease.  As the CDC recognizes, prison environments pose difficult circumstances for preventing and slowing the spread of this disease.  See CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, updated July 22, 2020, *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Sept. 10, 2020).  FCI Sheridan has been relatively successful in meeting this challenge so far.

6. To date, 0 employees out of a total 318 employees have tested positive for COVID-19. FCI Sheridan has offered on-site testing for employees, and many employees have accepted opportunities to be tested. The 0 positive cases are out of approximately 230 total staff tests. Additionally, staff have been provided information on two free testing sites in the local community.

7. To date, five inmates have tested positive, three are or were housed at the FDC, two are housed at the FCI (and were positive while *on intake* quarantine), and none are at the Prison Camp. The situation at FCI Sheridan has remained stable in the month since my Declaration in the *Stirling* matter. All but one inmate is considered recovered. The unrecovered inmate came in to the FDC isolation area from an airlift on September 4, 2020 and tested positive at intake. He is still in isolation but is now not symptomatic.

8. FDC inmates have been provided 1.) Two rounds of comprehensive testing for COVID-19, once in early July and once in mid-August, 2.) Continuous random testing, and 3.) Additional testing for inmates at risk (geriatric, HIV+, and those with pertinent chronic health conditions). *All* FDC inmates are again being tested today & tomorrow (September 14-15).

### SCREENING AND TESTING FOR COVID-19

9. FCI Sheridan is following BOP national guidelines for screening and testing inmates, staff and other correctional workers, and anyone else who enters or leaves the facility.

   a. All FCI Sheridan inmates receive regular nurse and paramedic evaluation to check for COVID-19 symptoms. In this context, regular means daily visits to each housing unit to deliver medication, and to review inmate concerns or symptoms in person or through paper Inmate Requests to staff. In addition, inmates may request clinical services on a daily basis (i.e., "sick call"), as needed, consistent with BOP policy. *See* Exhibit 1, BOP Program Statement 6031.04, Patient Care, pp. 21-23, Section 17;

Triage/Access to Care.

b. Any FCI Sheridan inmate that has COVID-19 symptoms is isolated and tested.

c. Where an inmate has been identified as having COVID-19, FCI Sheridan conducts strategic testing. For instance, an FDC inmate's positive test result on July 2 led to all but two FDC inmates being tested. The two holdouts refused multiple times to be tested, were educated on the reasons that testing is important, and were finally placed in quarantine. We would implement a similar protocol for staff in the event a single employee received a positive test result.

d. FCI Sheridan also conducts contact tracing and testing in response to inmates testing positive or presenting as symptomatic. For instance, in response to the July 20 positive case, all 120+ inmates in the J2 housing unit were screened for symptoms and tested (on July 21, 2020), quarantined in small cohorts, and then re-screened for symptoms and re-tested on August 4, 2020.

e. FCI Sheridan conducts periodic retesting of COVID-19 negative cases. We followed up on the mass testing on July 21, 2020, with serial retesting, consisting of a random sample of approximately five tests per day until 14 days from the last exposure to the positive inmate, i.e., until August 4, 2020. We have also begun random testing of inmates from all housing units, including the FCI, and Camp.

f. FCI Sheridan conducts mandatory daily screening for inmate workers, consisting of temperature and symptom checks. Any inmate with a fever, who fails any COVID-19 related health questions, or who exhibits any COVID-19 related symptoms is not permitted to work. Inmates who exhibit signs of illness are immediately referred to Health Services for testing and to be placed in quarantine or isolation.

g.  For staff, FCI Sheridan conducts mandatory daily screening, which consists of temperature checks and symptom assessment before entering the workplace. Any staff member with a fever, who fails any COVID-19 related health questions, or who exhibits any COVID-19 related symptoms is not permitted to work. FCI Sheridan staff who exhibit signs of illness are not permitted to return to the facility until their symptoms have resolved and they have been medically cleared to return to work. *See* Exhibit 2, COVID Screening Email, dated March 18, 2020; Exhibit 3, COVID Screening Email, dated March 19, 2020.

h.  Also for staff, FCI Sheridan offers periodic, mass testing of staff beyond mandatory daily screening. To date, staff have had seven (7) opportunities to be tested. These mass testing opportunities for staff have been voluntary, but largely accepted. To date, FCI Sheridan has conducted 230 staff tests, with all returning negative results. FCI Sheridan has also granted administrative leave for staff that wanted to be tested thorough their Primary Care Provider. FCI Sheridan staff have been given information on two freely available local testing sites.

i.  FCI Sheridan is currently using the CDC's symptom-based criteria for releasing any COVID-19 positive inmates from isolation. *See* Exhibit 4, BOP Medical Isolation Checklist COVID-19, dated July 31, 2020. Those who test positive are placed in medical isolation until they meet the symptom-based criteria FCI Sheridan implemented in adherence to the current CDC approach. A positive case must meet CDC criteria to be released from isolation.

10. FCI Sheridan is using two types of COVID-19 tests.

a.  An FDA-approved, rapid, point-of-care ("POC") test called the Abbott ID Now system. *See* www.abbott.com/IDNOW.html (last visited Sept. 10, 2020). This test

has received a waiver under the Clinical Laboratory Improvement Amendments ("CLIA") specifically for COVID-19 testing. *See* www.fda.gov/medical-devices/ivd-regulatory-assistance/clinical-laboratory-improvement-amendments-clia (last visited Sept. 10, 2020). Abbott ID Now testing occurs on-site, with results available in about 15 minutes.

b. The polymerase chain reaction ("PCR") test, which is sent out to a lab, and is the primary diagnostic test for the Sars-CoV-2 virus which causes COVID-19. The PCR test is a molecular test performed on respiratory secretions using nucleic acid amplification technology ("NAAT"), usually a reverse transcriptase-polymerase chain reaction ("RT-PCR"). The serial and random testing is done using the PCR test. For more information about PCR testing, *see* www.genome.gov/about-genomics/fact-sheets/Polymerase-Chain-Reaction-Fact-Sheet (last visited Sept. 10, 2020). For PCR testing, FCI Sheridan uses two laboratories: (1) The Oregon State Public Health Laboratory, a state public health lab that has returned test results to FCI Sheridan by the next day; and (2) Quest Diagnostics, a contract lab that has generally returned test results to FCI Sheridan within 3-5 days, but at times up to 14 days.

c. Initiating testing *prior* to the BOP national contract with Quest Diagnostics, FCI Sheridan coordinated with Yamhill County Public Health to use a grant-based testing facility, LabCorps. The results from this lab took between 5-14 days.

11. FCI Sheridan's comprehensive testing protocol requires the following to be tested.

a. All symptomatic inmates are tested.

b. All asymptomatic inmates with known or suspected contact with a COVID-19 case are tested.

c. All new intake inmates are tested twice. New intake inmates include new

commitments, voluntary surrenders, writ returns, and transfers. These inmates are tested upon entrance with a rapid test, and tested after 14-days of quarantine with a lab PCR.

   d.  All inmates returning from trips of more than 24 hours spent in the community are tested. This includes inmates returning from court hearings, hospital, furlough, etc.

   e.  All inmates on admission to quarantine and discharge from quarantine are tested.

   f.  All releasing inmates are tested.

   g.  All transferring inmates are tested.

12. FCI Sheridan continues to coordinate with local public health officials to plan for future mass testing of all inmates at FCI Sheridan, if indicated, in addition to the random testing and the inmates at the FDC who have already been tested multiple times. FCI Sheridan has begun randomly selecting inmates for testing from all housing units, including the Camp and FCI.

### OTHER PANDEMIC-RESPONSE MEDICAL MEASURES

13. FCI Sheridan issued masks to all staff and to all inmates. *See* Exhibit 5, Mandatory Face Covering, dated April 15, 2020; Exhibit 6, New Masks, dated April 22, 2020; Exhibit 7, Staff Fitness Center, dated April 2, 2020. FCI Sheridan requires staff to wear face coverings where six feet of physical distance cannot be maintained. Staff can remove face coverings only when in a private workspace where it is possible to keep at least six feet of distance from others. FCI Sheridan currently has a weekly contest where staff are awarded a shirt if their mask compliance has been voted as outstanding. *See* Exhibit 8, Email, dated July 31, 2020.

14. FCI Sheridan also educated all staff and inmates on the importance of wearing masks and maintaining physical distance of 6 feet. *See* Exhibit 9, Emails, dated July 20, 2020, and July 21, 2020.

15. FCI Sheridan's Command Center has, since March 2020, and continues to control storage and frequently inventory personal protective equipment to ensure the facility has enough masks, eye protection, gloves, and gowns to respond to an outbreak should one occur. *See* Exhibit 10, Weekly Chemical & PPE Inventory, dated Aug. 14, 2020.

16. The BOP's Modified Operations Protocol has imposed strict rules to ensure social distancing, and remains in effect. However, FCI Sheridan is also current in the process of implementing BOP National guidance to allow for social visiting to begin October 3, 2020. *See* Exhibit 11, Modification of Coronavirus (COVID-19) Phase Nine Action Plan, dated Aug. 31, 2020.

17. Our primary concern is maintaining the relatively low rate of incidence and transmission of the COVID-19 virus at FCI Sheridan, while ensuring safety and general order. The situation is obviously in flux. FCI Sheridan is conducting new tests or receiving new test results just about every day. We continue to monitor the situation, which can be subject to daily and rapid changes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of September, 2020.

AMANDA HUSTON
Health Services Administrator

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **DECLARATION OF AMANDA HUSTON IN SUPPORT OF RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS** was placed within a first class postage prepaid envelope, marked "LEGAL MAIL OPEN ONLY IN PRESENCE OF INMATE" and deposited in the United States Mail within the offices of the United States Attorney or at a United States Post Office according to established office practice at Portland, Oregon, on September 16, 2020 addressed to:

>     Dustin Carl Shepherd
>     FRN: 60163-060
>     FCI Sheridan
>     Inmate Mail/Parcels
>     P.O. Box 5000
>     Sheridan, Oregon 97378

>     /s/ Keith W. Ramsey
>     KEITH W. RAMSEY
>     Paralegal Specialist

**CERTIFICATE OF SERVICE**

Exhibit 10

(last visited Sept. 15, 2020 at 9:30 a.m.).  To date, the BOP has confirmed five cases among the 1,525

prisoners at FCI Sheridan, and all but one have recovered.  *See* Huston Decl., ¶ 7.  Two of the five are

housed at the FCI, where Shepherd is housed.  *See id.*  No FCI Sheridan employees have yet tested

positive.  *See id.* ¶ 6.

    Despite the ongoing risks of the pandemic, habeas relief is unjustified because an Eighth

Amendment claim requires a showing of deliberate indifference.  *Farmer*, 511 U.S. at 837.  Shepherd

must show that a prison official "knows of and disregards an excessive risk to inmate health or safety."

*Id.*  It is not enough to show that an official failed to avert a known, substantial risk of harm.  Prison

officials act constitutionally by responding "reasonably to the risk," even if the harm "ultimately was

not averted." *Id.* at 844; *see also Seiter*, 501 U.S. at 303 (explaining that "constraints facing the official"

are relevant to analyzing whether the official acts with deliberate indifference).

    Sheridan LA is Being Deliberate

    Most federal courts have recognized that the BOP is not likely being deliberately indifferent

to COVID-19 health risks.  *See Wilson v. Williams*, 961 F.3d 829, 839-44 (6th Cir. 2020) (reversing

district court's finding that success on the merits was likely, rejecting argument that the BOP's failures

to (1) successfully prevent the spread and (2) fully use available tools to depopulate FCI Elkton

amounted to deliberate indifference, and concluding that inmates had not sufficiently shown the

BOP's response was deliberately indifferent to the pandemic's serious risk of harm);[9] *Fernandez-*

*Rodriguez v. Licon-Vitale*, 2020 WL 3618941, at *2, 22-24 (S.D.N.Y. July 2, 2020) (denying preliminary

injunction, finding petitioners were "not substantially likely to show that MCC's failures were a result

of deliberate indifference to their plight"); *Hallinan v. Scarantino*, 2020 WL 3105094, at *6, 13-18

(E.D.N.C. June 11, 2020) (finding petitioners did not establish likelihood of deliberate indifference,

---

[9] Other circuit courts have stayed injunctions in the context of state prisons.  *See Swain v. Junior*, 958
F.3d 1081, 1089-90 (11th Cir. 2020) (per curiam) (staying preliminary injunction where preventative
measures "likely do not amount to deliberate indifference"); *Valentine v. Collier*, 956 F.3d 797, 801-03
(5th Cir. 2020) (per curiam) (same).

despite 19 reported deaths and 664 active inmate and staff infections at FCC Butner); *Chunn v. Edge*, 2020 WL 3055669, at *1 (E.D.N.Y. June 9, 2020) (acknowledging that a novel public health emergency with "no preexisting playbook" belies a suggestion that some "apparent deficiencies are the product of deliberate indifference" on the part of prison at the Metropolitan Detention Center in Brooklyn); *Grinis v. Spaulding*, 2020 WL 2300313, at *3 (D. Mass. May 8, 2020) (denying TRO and evaluating alleged deliberate indifference in light of only one inmate at FMC Devens being diagnosed with the COVID-19 virus, out of a population of about 1,000); *cf. Maney v. Brown*, 2020 WL 2839423, at *2 (D. Or. June 1, 2020) (finding Oregon state inmates did not establish deliberate indifference to conditions, and "quite the contrary is true").

Shepherd has not set forth facts sufficient to establish the subjective prong of an Eighth Amendment violation because FCI Sheridan officials are not ignoring the pandemic. Indeed, Shepherd acknowledges FCI Sheridan's response, though he criticizes it as both too strong (e.g., lockdown) and too weak (e.g., de-densifying, testing, sanitation). *See, e.g.*, ECF 1, Petition at 6-7. On the specific point of de-densifying, the Petition in *Stirling* reported that, on April 14, 2020, FCI Sheridan housed 1,787 inmates. *Stirling v. Salazar*, No. 3:20-cv-00000-SI, Dkt. 16, Am. Petition at 8 (D. Or. June 1, 2020). As of September 9, it housed 1,522, *see* Ingram Decl., ¶ 9, which is a reduction of 265 inmates or about 15 percent. Other operational measures include strict social distancing, enhanced sanitation, and depopulation efforts. *See* Ingram Decl., ¶¶ 12-28. These measures are being taken to ensure the safety of those at the FCI. *See id.* ¶¶ 8, 16, 28. They appear to be working well. The situation at the FCI is far better than at some other federal prison facilities. For example, to date, only two inmates at the FCI have tested positive for COVID-19, and those cases were detected on arrival to the FCI. *See* Huston Decl., ¶ 7. No staff member has tested positive. *Id.* ¶ 6; *cf. Hallinan*, 2020 WL 3105094, at *6, 13-18 (E.D.N.C. June 11, 2020) (noting 19 reported deaths and 664 active inmate and staff infections at FCC Butner).

Exhibit 11

FCI Sheridan, Updated March 2020

## Quarantine: To separate a person from others, preventing the introduction of illness into a population. The separated person is NOT showing signs of illness. This is a PREVENTIVE measure.

**HOW TO PROTECT OUR INMATES, AND YOURSELF:**

1.) PPE (Personal Protective Equipment) is <u>required</u>.

2.) Use the SAME surgical mask for all the quarantine cells unless you come into significant body contact with the inmate.

3.) Physical distance from others AND handwashing are THE BEST ways to prevent the introduction and spread of illness.

4.) If talking to the inmate through the door, don't do anything differently. Communicate this way as much as possible! Use <u>physical distance</u> to separate yourself from the inmate.

5.) If opening the trap, or the door: <u>Wear a mask and gloves!</u> Always change your gloves and sanitize or wash when moving on to the next cell.

6.) If touching the inmate, then wear a disposable gown. This should rarely happen.

7.) Only new inmates are being quarantined. Don't do anything different with our current inmates.

8.) Ask a question of Health Services before you act!

# QUARANTINED CELLS ARE

# OUT OF

# BOUNDS

# DO NOT EXCHANGE ANYTHING THROUGH THE DOOR.

Exhibit 12

 Centers for Disease Control and Prevention

# Coronavirus Disease 2019 (COVID-19)

 MENU



WEAR A MASK. PROTECT OTHERS.

# People with Certain Medical Conditions
# People with Certain Medical Conditions

Updated Aug. 14, 2020          Print



## Summary of Recent Changes

Revisions were made on July 17, 2020 to reflect recent data supporting increased risk of severe COVID-19 among individuals with cancer. The listed underlying medical conditions in children were also revised to indicate that these conditions might increase risk to better reflect the quality of available data currently. We are learning more about COVID-19 every day, and as new information becomes available, CDC will update the information below.

People of any age with certain underlying medical conditions are at increased risk for severe illness from COVID-19:

People of any age with the following conditions are at increased risk of severe illness from COVID-19:

- Cancer
- Chronic kidney disease
- COPD (chronic obstructive pulmonary disease)
- Immunocompromised state (weakened immune system) from solid organ transplant
- Obesity (body mass index [BMI] of 30 or higher)
- Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies
- Sickle cell disease
- Type 2 diabetes mellitus

COVID-19 is a new disease. Currently there are limited data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19. Based on what we know at this time, people with the following conditions might be at an increased risk for severe illness from COVID-19:

- Asthma (moderate-to-severe)
- Cerebrovascular disease (affects blood vessels and blood supply to the brain)
- Cystic fibrosis
- Hypertension or high blood pressure

## Obesity

Having obesity, defined as a body mass index (BMI) of 30 or above, increases your risk of severe illness from COVID-19.

**Actions to take**

- Take your medicines for any underlying health conditions exactly as prescribed.
- Follow your healthcare provider's recommendations for nutrition and physical activity, while maintaining social distancing precautions.
- Call your healthcare provider if you have concerns or feel sick.
- **If you don't have a healthcare provider,** contact your nearest community health center ☑ or health department.

Learn more about obesity in adults.

Learn about obesity in children.

## Neurologic conditions such as dementia

Having neurologic conditions such as dementia may increase your risk of severe illness from COVID-19.

**Actions to take**

- Take your medicines as prescribed.
- Make sure that you have at least a 30-day supply of your medicines.
- Call your healthcare provider if you have concerns about your condition or feel sick.
- **If you don't have a healthcare provider,** contact your nearest community health center ☑ or health department.

Learn more about dementia.

Learn about caring for people living with dementia during COVID-19.

Learn about amyotrophic lateral sclerosis (ALS).

## Smoking

Being a current or former cigarette smoker may increase your risk of severe illness from COVID-19.

**Actions to take**

- If you currently smoke, quit. If you used to smoke, don't start again. If you've never smoked, don't start.
- Counseling from a healthcare provider and Food and Drug Administration (FDA)-approved medications can **double** the chances of quitting smoking.
- For help quitting smoking, call 1-800-QUIT-NOW or visit smokefree.gov ☑ .
- Call your healthcare provider if you have concerns or feel sick.
- **If you don't have a healthcare provider,** contact your nearest community health center ☑ or health department.

Learn about smoking and tobacco use.

Learn about the health effects of cigarette smoking.

Exhibit 13

TRULINCS 37833086 - WELLS, NATHANIEL JR - Unit: SHE-B-L

---------------------------------------------------------------------------------------------------------

FROM: Shatayproctor@yahoo.com
TO: 37833086 WELLS, NATHANIEL JR
SUBJECT: hope this help
DATE: 06/17/2020 02:51 PM

Is there evidence obesity is a risk for the virus?
This question has been the subject of many studies as experts try to work out the answer.

In a study of nearly 17,000 hospital patients with Covid-19 in the UK, those who were obese - with a body mass index (BMI) of more than 30 - had a 33% greater risk of dying than those who were not obese.
A separate study of NHS electronic health records found a doubling of the risk of dying from Covid-19 among people who were obese. If other health conditions linked to obesity such as heart disease and type 2 diabetes were also taken into account the risk would be even higher, the researchers said.
And a study of critically ill patients in UK intensive care units found that nearly 34.5% were overweight, 31.5% were obese and 7% morbidly obese (a total of 73%), compared to 26% with a healthy BMI.
These figures compare to 64% overweight and obese in the UK population - 35% with a BMI of 25-29 and 29% with a BMI of 30 or higher.

Body mass index is calculated as someone's weight in kilograms divided by their height in metres squared.

Given high rates of global obesity, the World Obesity Federation says a high percentage of people who contract coronavirus "will also have a BMI over 25". Early studies from the US, Italy and China also suggest it is an important risk factor.

Ageing, being a man and underlying health issues all increase the risk of becoming more seriously ill from Covid-19.

Why is being obese a risk?
The more overweight you are, the more fat you're carrying, the less fit you are and the lower your lung capacity. This means it is a bigger struggle to get oxygen into the blood and around the body. This impacts on the heart and blood flow too.

"Because people are more overweight, they also have a demand for more oxygen. So that means their system is actually undergoing greater pressure," says Prof Naveed Sattar, from the University of Glasgow.

During an infection like coronavirus, this can be serious.

"Eventually the obese body becomes overwhelmed by the lack of oxygen getting to the major organs," says Dr Dyan Sellayah, from the University of Reading.

That is one reason why overweight and obese people in intensive care are more likely to need assistance with breathing and support with kidney function.
What role do fat cells play?
Scientists have discovered that an enzyme called ACE2, present in cells, is the main way for the virus to enter the body.

Higher levels of this molecule are thought to be found in adipose tissue, or fatty tissue, which people who are obese have more of - under the skin and around their organs.

That could be one reason they have a higher risk of catching the disease and a higher risk of being ill with it.

Is the immune system affected too?
On top of everything else, the ability of the body to fight off the virus - known as the immune response - is not as good in people who are obese.

That's due to inflammation driven by immune cells called macrophages which invade our fat tissue. They interfere with how our cells respond to infection.

According to scientists, this can lead to a 'cytokine storm' - a potentially life-threatening over-reaction of the body's immune system which causes inflammation and serious harm.

A specific type of fat tissue is prone to macrophage invasion. This may explain why people from black, African and ethnic minority backgrounds (BAME), who have more of this type of tissue, "have elevated rates of diabetes, and may be more

TRULINCS 37833086 - WELLS, NATHANIEL JR - Unit: SHE-B-L

----------------------------------------------------------------------------------------------------------------

FROM: Shatayproctor@yahoo.com
TO: 37833086 WELLS, NATHANIEL JR
SUBJECT: this is all i see
DATE: 09/28/2020 09:51 AM

As patients with confirmed cases of COVID-19 first began arriving at Johns Hopkins Hospital in Baltimore in March, cardiologist David Kass heard surprising observations from his colleagues in the ICU. First, the patients were younger than expected, in light of reports from China and Italy that the virus mostly endangered the elderly. Second, many of the patients in Baltimore were obese.

"Even based on about 20 patients at first, the finding was already significant," says Kass, a professor of medicine who leads the Institute of CardioScience within the Johns Hopkins School of Medicine. "But at the time you could do a Google search of 'COVID-19 and obesity' and you got basically nothing."

Image of virus and cells
Johns Hopkins responds to COVID-19
Coverage of how the COVID-19 pandemic is affecting operations at JHU and how Hopkins experts and scientists are responding to the outbreak

In the weeks since, a number of studies and anecdotal reports have pointed to obesity being a notable risk factor for COVID-19 and often the primary risk factor for younger patients. This month, Kass and two Hopkins colleagues gathered preliminary findings from six ICU units around the United States, concluding in a Lancet report that "in populations with a high prevalence of obesity, COVID-19 will affect younger populations more than previously reported."

This risk is particularly relevant in the U.S. because the prevalence of obesity is around 40%, compared to a prevalence of about 6% in China and 20% in Italy.

The Hub recently spoke with Kass for more insight on why obesity is associated with more severe outcomes and how that should change our thinking about the best ways to stay safe.

What are you and other experts seeing with the early data?
After the initial observations at Hopkins, we had enough data to see a significant correlation between having a higher BMI (Body Mass Index) and a younger age in the COVID-19 patients requiring intensive care. So I emailed about 35 cardiology friends of mine across the country who helped connect us to ICU physicians in a diverse areas spanning from Washington state to New York City and Florida. We ended up with data from six hospitals related to about 260 patients, and they all followed the same relationship we'd first seen at Johns Hopkins.

"THE MESSAGE IS THAT YOU NEED TO TREAT OBESITY SERIOUSLY AS A PRE-EXISTING CONDITION THAT INCREASES YOUR RISKS FOR COVID-19. ... IF YOU'RE OBESE AND YOU'RE 25, OR 35, OR 45, YOU HAVE A RISK FACTOR AND YOU SHOULD BE APPROPRIATELY CAREFUL."
David Kass
Cardiologist
While this study for The Lancet was in process, the topic of obesity started gaining more attention. A New York Times editorial by two physicians pointed to the problem, and obesity was noted as a potential factor with the eruption of severe cases in New Orleans. So there was this moment of, "Hey, wait a minute, America. You may think you don't have pre-existing risk factors for COVID-19, but guess what? Here's one we haven't been talking about."

TRULINCS 37833086 - WELLS, NATHANIEL JR - Unit: SHE-B-L

---------------------------------------------------------------------------------------------------

FROM: Shatayproctor@yahoo.com
TO: 37833086 WELLS, NATHANIEL JR
SUBJECT: ....
DATE: 09/28/2020 10:06 AM

What do you think the message is for people who are currently obese, in their understanding of COVID-19?
I think the message is that you need to treat obesity seriously as a pre-existing condition that increases your risks for COVID-19. Maybe you didn't consider that because you're young, and thought of this as an old person thing. But no if you're obese and you're 25, or 35, or 45, you have a risk factor and you should be appropriately careful.

If you're in a state that decided to open up commercial establishments like bars and restaurants, and you might normally go to these places, think twice; or at a minimum, take the precautions of wearing a mask and social distancing. These precautions have been voluntary around the country, and we're seeing large variability in how people follow these recommendations even to the point of it becoming a political statement. That's unfortunate, since the virus does not care about politics. If you're substantially obese, this is the time to be prudent: wear the mask, keep a distance from others, and contact your doctor sooner than you might otherwise if you feel sick. This is your life.

What about from the physician's standpoint?
As physicians, we've become somewhat inured to obesity in our country since there's so many people with BMIs of 35 and up and you start thinking of it almost as normal. But this doesn't take away the medical realities. With COVID-19, it means your patients with high BMIs may need more medical attention, and their symptoms should be taken seriously maybe they come for in-person care sooner. This patient needs to be considered as you would others with pre-existing risk factors.

TRULINCS  37833086 - WELLS, NATHANIEL JR - Unit: SHE-B-L

-------------------------------------------------------------------------------------------------------

FROM: Shatayproctor@yahoo.com
TO: 37833086 WELLS, NATHANIEL JR
SUBJECT: ...
DATE: 09/28/2020 10:21 AM

Obesity Worsens Outcomes from COVID-19
Adults with obesity are at even greater risk during the COVID-19 pandemic:

Having obesity increases the risk of severe illness from COVID-19.
Having obesity may triple the risk of hospitalization due to a COVID-19 infection.
Obesity is linked to impaired immune function.2,3
Obesity decreases lung capacity and reserve and can make ventilation more difficult.4
As BMI increases, the risk of death from COVID-19 increases.5
Studies have demonstrated that obesity may be linked to lower vaccine responses for numerous diseases (influenza6, Hepatitis B7,8,9, tetanus10).

TRULINCS  37833086 - WELLS, NATHANIEL JR - Unit: SHE-B-L

----------------------------------------------------------------------------------------------------------------

FROM: Shatayproctor@yahoo.com
TO: 37833086 WELLS, NATHANIEL JR
SUBJECT: obesity
DATE: 06/30/2020 04:21 PM

The WHO has highlighted non-communicable diseases (NCDs) as a risk factor for becoming seriously ill with COVID-19 [1].
Based on emerging data and the patterns of infection we have seen in other viral infections, overweight and obesity are also
likely to be risk factors for worse outcomes in those who are infected by COVID-19. In the UK, a report suggests that two thirds
of people who have fallen seriously ill with coronavirus were overweight or had obesity [2]. Meanwhile, a report from Italy
suggests 99% of deaths have been in patients with pre-existing conditions, including those which are commonly seen in people
with obesity such as hypertension, cancer, diabetes and heart diseases. [3]
The COVID-19 pandemic and the measures that have had to be taken to help curb COVID-19 are likely to have a number of
impacts for people living with obesity, as well as on the health of the general population.. A number of these also represent
underlying root causes of obesity and thus risk exacerbating the challenge of obesity. This includes:

Strained food systems and supply chains due to concerns of food shortages, as well as an increased reliance on processed,
long-life foods and a reduction in fresh fruit and vegetables and unprocessed meat
Food insecurity amongst the most vulnerable who have reduced access to shops and may have reduced access to normal food
assistance programmes e.g. due to school closures
Reduced opportunities for people to be physically active as movement is restricted
An impact on mental health, due the seriousness of the emerging situation and challenges faced from isolation, reduced
physical activity, social engagement and employment changes
Impacts on health systems and exacerbated challenges for treatment access for people living with obesity, including potential
reductions in elective surgical procedures (e.g. bariatric surgery), and modifications to or curtailment of multidisciplinary team
management, group weight loss programs and other forms of ambulatory care

Nathaniel Welk Jr. # 37633-086
Federal Correctional Institution
FCI Sheridan
P.O. Box 5000
Sheridan, OR 97378

Honorable Ricardo S. Martinez
United States Courthouse
700 Stewart St, Suite 2310
Seattle, WA 98101



9505 5131 5681 0280 2263 51

FILED
LODGED
RECEIVED

OCT 08 2020

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY